**OAK TREE FARM DAIRY, INC., et al., Dellwood Foods, Inc., Weissglass Gold Seal Dairy Corp., Plaintiffs,**

v.

**John R. BLOCK, Secretary of Agriculture of the United States, Defendant.**

**Nos. 79 CV 653, 79 CV 1960 and 79 CV 2026 (ERN).**

United States District Court, E. D. New York.

Aug. 19, 1982.

Harry Polikoff, New York City, for plaintiffs in 79 CV 653.

Botein, Hays, Sklar & Herzberg, New York City by Stanley M. Kolber, Paul Chessin, New York City, for plaintiff Dellwood.

Darrin H. Berger, Huntington, N. Y., for plaintiff Weissglass.

Edward R. Korman, U. S. Atty., E. D. N. Y., Brooklyn, N. Y. by Reuben S. Koolyk, Asst. U. S. Atty., and Thomas R. Clark, U. S. Dept. of Agriculture, Washington, D. C., for defendant.

## MEMORANDUM OF DECISION AND ORDER

NEAHER, District Judge.

These consolidated actions under the Agricultural Marketing Agreement Act of 1937, as amended ("the Act"), 7 U.S.C. § 608c, seek review, pursuant to § 608c(15)(B), of a final decision of the defendant Secretary of Agriculture ("Secretary") upholding the validity of a portion of Milk Marketing Order No. 2 ("Order 2"), 7 C.F.R. § 1002 (1976), which governs the pricing and classification of milk and milk products in the New York-New Jersey marketing area. Plaintiffs are licensed milk handlers, i.e., processors of milk and milk products, subject to the provisions of Order 2, which was promulgated by the Secretary under the Act.[1] They have moved for summary judgment and defendant has similarly cross-moved, both parties agreeing that there are no material issues of fact. This is the second time the actions have been before the Court on the merits. See *Oak Tree Farm Dairy, Inc. v. Butz*, 390 F.Supp. 852 (E.D.N.Y.1975), hereinafter referred to as "*Oak Tree I*", remanding the matter to the Secretary for further proceedings.

### I

The operation and complex economic, social and legislative background of the present milk marketing regulatory scheme have been canvassed amply in the decisions, e.g., *Zuber v. Allen*, 396 U.S. 168, 172–79, 90 S.Ct. 314, 317–20, 24 L.Ed.2d 345 (1969); *United States v. Rock Royal Co-Operative, Inc.*, 307 U.S. 533, 542–48, 59 S.Ct. 993, 998–1001, 83 L.Ed. 1446 (1939); *Schepps Dairy, Inc. v. Bergland*, 628 F.2d 11, 13–15 (D.C.Cir.1979), and only a brief review of some salient features is needed to set the proper perspective for the present case.

As noted in *Oak Tree I*, the Act, which is part of the Agricultural Adjustment Act of 1935, as amended, 7 U.S.C. § 601 et seq., sought to eliminate what Congress, then confronting the economic dislocations caused by the Great Depression, had perceived was ultimately deleterious competition among the producers of milk (and other agricultural commodities) for marketing outlets, and, conversely, to restore "orderly marketing conditions" to ensure both the continuous supply of such commodities to consumer markets and the payment of "parity prices" to the producers. See 7 U.S.C. § 602(1), (4) (declaration of Congressional policy). In the special case of milk, Congress had to recognize that the milk used by handlers to satisfy the relatively inelastic demand for fluid or drinking milk historically had commanded a higher price for producers than the milk the handlers used to make butter, cheese and other dairy products. Indeed, it was producer competi-

---

1. Order 2 defines "handlers" as

"(a) Any person who engages in the handling of skim milk or butterfat which was received at a pool plant, a partial pool plant, a pool unit or a partial pool unit or at a plant approved by any health authority as a source of skim milk or butterfat for disposition as fluid milk products in the marketing area; [or]

(b) Any person who engages in the handling of fluid milk products, all or a portion of which is shipped to, or received in, the marketing area." 7 C.F.R. § 1002.7.

Handlers are thus distinguished from "producers" (defined as "any dairy farmer" or other "person who produces milk," id., § 1002.5), who deliver "pool milk" to a pool plant or pool unit operated by a handler. 7 C.F.R. § 1002.6.

The milk marketing order regulates the activities of milk handlers to benefit producers. The Act provides the following mechanism for handlers to secure review of any provision of milk marketing orders in 7 U.S.C. § 608c(15):

"(A) Any handler subject to an order may file a written petition with the Secretary of Agriculture, stating that any such order or any provision of any such order or any obligation imposed in connection therewith is not in accordance with law and praying for a modification thereof or to be exempted therefrom. He shall thereupon be given an opportunity for a hearing upon such petition, in accordance with regulations made by the Secretary of Agriculture, with the approval of the President. After such hearing, the Secretary shall make a ruling upon the prayer of such petition which shall be final, if in accordance with law.

(B) The District Courts of the United States in any district in which such handler is an inhabitant, or has his principal place of business, are vested with jurisdiction in equity to review such ruling, provided a bill in equity for that purpose is filed within twenty days from the date of the entry of such ruling."

tion for the higher valued fluid handler outlets in a time of falling prices, worsened by the oversupply of milk during the spring and summer months when cows are more productive, that precipitated Congressional action.

To eliminate harmful price competition, Congress decided to ensure that producers would share evenly in the higher and lower valued sales of milk to handlers by providing a method for fixing a uniform blend price which handlers pay producers for all milk they have received, regardless of the actual use to which a particular producer's milk is put. The Act also authorizes the Secretary to establish "use classifications" for classifying milk according to how handlers "use" it, and handlers are required to account and pay for their disposition of producer milk within such classifications. Milk used as fluid, drinking milk, is classified and priced in Class I. Milk used to produce other dairy products is put in one or more lower classes. Currently in Order 2 there is a single Class II; formerly there were four or five classes, and further price subdivisions within each class. Essentially, the uniform blend price is arrived at by dividing the total volume of milk producers have sold to handlers by the combined total dollar volume of Class I and Class II handler dispositions.

During each accounting period handlers pay producers for the milk on receiving it, based upon the handlers' estimates of how much milk they will use in Class I or Class II. Since the estimates typically exceed or fall below a handler's actual utilization of milk in the various classes, at the close of an accounting period the handlers contribute or withdraw further sums from an equalization pool, the producers settlement fund, to equalize their net payments to producers based upon their actual utilization.

Handlers must account and pay for all milk they receive from producers. All federal milk marketing orders accordingly provide for the classifying and accounting of milk shrinkage, which for purposes of this proceeding refers to the volume of milk lost after its receipt from producers by reason of adhesion, evaporation and spillage during transportation, processing and laboratory testing, and also milk returned to handlers from retail outlets and dumped by them. See Vol. 9, Doc. 105, Transcript of Oral Argument before Judicial Officer, 116, 120. Shrinkage essentially is milk which handlers must purchase without receiving a direct return. An order's classification scheme determines in which class, and therefore the price at which handlers must account and pay for shrinkage. Immediately prior to amendments effective Nov. 1, 1977 and March 1, 1979, see 42 Fed.Reg. 41582, 41597–98 (1977); 43 Fed.Reg. 57914 (1978), Order 2 treated shrinkage in the following manner:

"Shrinkage shall be classified at each plant or unit as follows:

(a) Compute the total shrinkage of skim milk and butterfat respectively at each plant or unit.

(b) Such shrinkage shall be assigned pro rata to classes of use in accordance with the respective volumes of skim milk and butterfat actually accounted for in each class: *Provided*, That shrinkage assigned to Class II shall not exceed 2 percent of the skim milk and butterfat, respectively, in such class actually accounted for and any excess thereof shall be classified as Class I–A." 7 C.F.R. § 1002.42 (1975).

Plaintiffs handle Class I milk almost exclusively, and thus under Order 2 were required to account for shrinkage losses at the higher Class I price. Consequently, they almost always contributed rather than withdrew balancing amounts from the equalization pool. More importantly, plaintiffs considered themselves at a competitive disadvantage with handlers in other marketing areas, especially those in the bordering Middle Atlantic Order 4. In that area and more than 70 other milk marketing order areas a stated percentage, typically two percent, of the monthly inventory of producer milk receipts could be classified and accounted for as shrinkage in the lowest use classification, regardless of the handler's actual dispositions or classes of use, although shrinkage above the allowed percentage would be allocated to Class I, again regardless of actual use.

This suit had its genesis over a decade ago when plaintiff Oak Tree Farm Dairy, Inc. ("Oak Tree") petitioned the Secretary for a hearing under 7 U.S.C. § 608c(15)(A), seeking review of the validity of Order 2's shrinkage provisions. Following a hearing and subsequent dismissal of the petition by the Secretary's Judicial Officer,[2] review was sought in this Court under 7 U.S.C. § 608c(15)(B). As already noted, *Oak Tree I* resulted in a remand of the case for further administrative proceedings. The Court then concluded that this was required because the administrative record contained only "fleeting and conclusory" references to the two main issues formulated on Oak Tree's appeal. These were (1) whether as a matter of statutory construction the Act precluded the Secretary from classifying shrinkage in the highest "use" classification because shrinkage as such has no "value" for a handler, and (2) whether, under 7 U.S.C. § 608c(4) and (11), and the Administrative Procedure Act, 5 U.S.C. § 557(b), the Secretary improperly failed to make adequate findings and conclusions, including whether it was necessary to treat shrinkage differently under Order 2 than under other milk marketing orders.

After the remand order, Oak Tree sought by a "supplemental" petition to broaden its attack on § 1002.42 by including for review the record underlying the Secretary's decision published at 36 Fed.Reg. 17580 (Sept. 2, 1971), which had denied after formal rulemaking proceedings the petition of several handlers to amend the Order 2 shrinkage provision to conform it to that in the neighboring Middle Atlantic Order, Order 4, 7 C.F.R. §§ 1004.41(b), 1004.42 (1970). Twelve other handlers, the remaining plaintiffs in the present actions, filed similar review petitions under § 608c(15)(A), which then were consolidated and included for review before an Administrative Law Judge ("ALJ") with Oak Tree's remanded petition. Oak Tree and two of the new petitioners requested class action treatment for the common issues of the validity of the shrinkage provision and monetary relief.

In *Oak Tree I*, 390 F.Supp. at 856 n.6 and 860 n.16, the Court had suggested that full determination of the validity of Order 2's almost unique treatment of shrinkage might require review of numerous sets of administrative findings made over the years with respect to the challenged provisions. Relevant portions of prior rulemaking proceedings pertaining to shrinkage relied upon by the parties were annexed as exhibits to their briefs before the ALJ.

These show, in brief, that the method of shrinkage treatment complained of originated when Order 2's predecessor, Order 27, was first promulgated for the New York marketing area in 1938 and that it was continued in 1944 when extensive amendments were instituted, including one permitting up to five percent shrinkage (as determined by the market administrator) to be accounted for in each of numerous different plant operations required to process a particular product. In 1968 the handlers were required to account for milk on the basis of both butterfat and skim milk content, rather than butterfat alone as under previous Order provisions. In conjunction with this change, the Secretary eliminated loss allowances for specific operations, lowered the limit on permissible shrinkage to two percent for the remaining relevant handling operations, and retained the principle of allocating shrinkage according to the handler's actual classes of use. Finally, it appears that Order 2's treatment of shrinkage was retained in 1971 when the Secretary denied the petition of several handlers to conform it to Order 4's method by eliminating the rule requiring allocation to the actual classes of use.

After holding a hearing at which the plaintiffs introduced expert testimony as to the meaning of "use classification," and the parties stipulated as to the composition of the record and the issues for review, the ALJ invalidated the shrinkage provisions, fundamentally because the 1968 changes had made Order 2's treatment of shrinkage "entirely different" without substantial evi-

---

**2.** Pursuant to 7 U.S.C. § 450c–450g, the Judicial Officer has been delegated the Secretary's final administrative authority to decide the Department of Agriculture's own cases.

dentiary support in the record, and because the Secretary had failed adequately to rule on exceptions to the recommended decision, which had objected that no witness supported the precise changes instituted. See Vol. 6, Doc. 83 at 69–70, 86. The ALJ further ruled that the 1971 record and Secretary's decision did not remedy the deficiencies of the 1968 proceedings. *Id.* at 89. Nevertheless, the ALJ denied monetary recovery on the ground that the "catch-all" classification provision, 7 C.F.R. § 1002.-42(a)(3) (1976), required classification of the shrinkage in Class I. Vol. 6, Doc. 83 at 75, 89.

On cross-appeals by the Secretary and the plaintiffs, the Judicial Officer reversed the ALJ. He held 'that the classification of shrinkage by allocating it pro rata to the classes of use according to the volumes of milk actually accounted for in those classes was authorized by the Act and supported by sufficient evidence when the regulation was first promulgated in 1938. He further ruled that the continuation of this classification of shrinkage, following the rulemaking proceedings in 1944 and 1968, did not require substantial support in those hearing records, since the continuation of a provision is not an order or amendment subject to the requirements of 7 U.S.C. § 608c(4), but that the continuations, nonetheless, were supported by substantial record evidence. With respect to the 1968 and particularly the 1971 hearings, at which proposals were made to conform Order 2 shrinkage treatment to the method followed in other orders, the Judicial Officer held that the Secretary possessed complete, and unreviewable, discretion whether or not to amend an order, even where the record adequately supported doing so, which the

Judicial Officer believed the 1968 record, at least, did not.

In addition, the Judicial Officer held that the Act in 7 U.S.C. § 608c(11)(C) did not require uniform order provisions for different marketing areas where there were no differences in production or marketing conditions, implicitly rejecting this Court's suggestion in *Oak Tree I* that findings supported by hearing record evidence were required under this portion of the Act to explain why different provisions were promulgated. See 390 F.Supp. at 859–60. He also affirmed the ALJ's denial of class treatment for the claims and indicated disagreement with the ALJ's application of the catch-all provision.

▮ In the present review proceedings plaintiffs have again pressed for class action treatment of their claims. Their request must be denied. The proposed class includes handlers who did not exhaust their available administrative remedies. Since district court jurisdiction under 7 U.S.C. § 608c(15)(B) exists only to review final rulings by the Secretary upon particular petitions submitted by individual handlers under § 608c(15)(A), the Court lacks jurisdiction to entertain unexhausted claims of other handlers. See *Weinberger v. Salfi*, 422 U.S. 749, 763–64, 95 S.Ct. 2457, 2465–66, 45 L.Ed.2d 522 (1975).[3]

Substantively, in contending that the Secretary's decision upholding former § 1002.-42 is not in accordance with law and should not be sustained, plaintiffs argue first, as in *Oak Tree I*, that Congress, by authorizing the classification of milk "in accordance with the form in which or the purpose for which it is used," and the establishment of "use classifications" for the fixing of mini-

---

**3.** Plaintiffs err in suggesting that the class action provision of Rule 23, F.R.Civ.P., may override the concurrent decisions of the ALJ and the Judicial Officer that class action treatment was unauthorized by the Department's Rules of Practice for (15)(A) review proceedings, 7 C.F.R. § 900.50–71, and undesirable besides. The federal rules in terms only "govern the procedure in the United States district courts in all suits of a civil nature." Rule 1. The administrative agencies enjoy "wide latitude" to fashion their own rules of procedure for the dis-

charge of their duties. See, *e.g., Silverman v. Commodities Futures Trading Commission*, 549 F.2d 28, 33 (7th Cir. 1977). Due process did not require that the Department accord class action treatment to the present claims. Furthermore, to certify a class at this stage of the proceedings would undermine the Department's two-year statute of limitations upon the filing of claims by handlers to recover money alleged to be due from the market administrator under an order, 7 C.F.R. § 1000.6(d).

mum prices, 7 U.S.C. § 608c(5)(A), intended a system of classification by "value." They argue that the words "used" and "use" in the statutory provision authorizing classification embody the concept of "sales value," and further, that such classification by value precludes classifying shrinkage in any but the lowest use classification.

Second, plaintiffs argue that insufficient evidence and findings supported the Secretary's initial decision to include the challenged provision in Order 2's predecessor, and that this defect was not cured in subsequent rulemaking proceedings. They also contend that the action of the Secretary in not amending but continuing the same treatment of shrinkage in 1968 and 1971 was not in accordance with law because it was unsupported by necessary findings and hearing record evidence. Also in dispute is whether plaintiffs may recover any monetary relief in this Court if the Secretary's decision is overturned.

Plaintiff Oak Tree originally commenced this litigation primarily to change the treatment of shrinkage in Order 2 to conform to its treatment in other federal orders. That goal was accomplished in the course of the remand proceedings after *Oak Tree I* by the successive 1977 and 1979 amendments to Order 2, referred to *supra*. The validity of Order 2's prior treatment of shrinkage remains at issue, therefore, only to determine the plaintiffs' claims to recover alleged overpayments for shrinkage through February 1979.

## II

The threshold question here is the proper interpretation of the statutory language under which the Secretary issued the challenged provision. "In the case of milk and its products," 7 U.S.C. § 608c(5), Congress authorized the Secretary to issue, in the manner prescribed by § 608c(1), (3), (4), marketing orders containing only specified terms, including

"[c]lassifying milk in accordance with the form in which or the purpose for which it is used, and fixing, or providing a method for fixing, minimum prices for each such use classification which all handlers shall pay, and the time when payments shall be

made, for milk purchased from producers or associations of producers." *Id.* § 608c(5)(A).

In construing Congress' delegation of power to the Secretary to classify milk, it is common ground for the parties that the volume of milk handlers must account and pay for includes whatever amount of shrinkage occurs in the handlers' operations. The issue dividing them is whether the grant of authority quoted above permits the Secretary to classify shrinkage in the highest use classification.

Plaintiffs have advanced a technical and narrow interpretation of the Secretary's authority. As noted, they argue that the Secretary is empowered to classify milk only according to its value. Since the value of milk varies with its use by the handler, they urge that the core of "use classification" and therefore the most significant "value factor" under the statute, is the sales value of the milk to a handler.

Plaintiffs point to numerous instances where the Supreme Court and lower courts have explained the operation of the "use classification" system by reference to the fundamental fact that, broadly viewed, the value of milk varies with its "use" for fluid or manufacturing purposes. Furthermore, at the hearing on remand, they adduced expert testimony to show that before the Act was passed, some producer cooperatives—from whom, the legislative history indicates, Congress openly borrowed the use classification system—and other contemporaneous and later authorities understood that the Class I price was reserved solely for the volume of milk actually sold in Class I, with shrinkage therefore relegated to a lower price class. Plaintiffs underscore the significance of the foregoing by reference to part of the legislative history which reveals Congress' intent that the Secretary adopt "terms [which] follow the methods employed by [producer] cooperatives" prior to the Act. S.R.No. 1011 (74th Cong., 1st Sess.), at 9.

Plaintiffs thus interpret the statute to permit the Secretary to classify as Class I only milk that could have a sales value to

the handler. Since it is undisputed that shrinkage has no actual Class I (or, indeed, any) sales value, plaintiffs conclude that it cannot be placed in Class I, and therefore the shrinkage provisions which classify it as such, rather than as the lowest Class, are not authorized by the Act. Plaintiffs' attack on the provision is summarized in their characterization of it as "an irrebuttable presumption that all shrinkage is a volume of milk marketed in the highest valued Class I" (Oak Tree Br. at 27), which, they contend, is an unsupportable interpretation of the statute.

The Secretary, on the other hand, interprets his statutory grant of power to classify milk as authority to select a method, not inconsistent with the declared purposes of the Act, by which a value may be assigned to something which concededly earns no return but which handlers must account for in paying producers for milk received. He does not dispute that all shrinkage, even that of exclusive Class I handlers, may be assigned automatically to the lowest use class, for example, to maintain an equitable inter-order competitive relationship as was the case when Order 2 was modified effective 1979. See 43 Fed.Reg. at 57915 (1978). Indeed, every milk marketing order currently classifies up to two or three percent shrinkage in the lowest class. He maintains, however, that shrinkage legitimately and "with equal logic" can be classified in accordance with the classes for which a handler has used the milk, and be allocated to those classes in proportion to the respective volumes of milk utilized in those classes.

The Secretary defends his position primarily through an appeal for deference to his interpretation. He argues that it reflects a reasonable construction of the language Congress used. By contrast, he points out that logically plaintiff's position would require invalidation of all shrinkage provisions that allocate shrinkage above the stated percentage to Class I.

On the matter of deference, the Secretary emphasizes that the interpretation he defends was both contemporaneous and long-standing, and that administration of the Act is his responsibility. The challenged "pro rata" principle was part of the original New York marketing order promulgated in 1938 soon after passage of the Act, and necessarily the Secretary then interpreted § 608c(5)(A) to permit classification of shrinkage in accordance with the actual classes and volumes of milk used. Moreover, the principle went unchallenged for over thirty years, until Oak Tree commenced the prior review proceedings.

Familiar principles of statutory interpretation thus seem to support the Secretary's claim to deference to his interpretation. A typical statement is the following passage from *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965):

"When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. 'To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.' ... 'Particularly is this respect due when the administrative practice at stake "involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new."'" (Citations omitted.)

See also, *e.g., Mazer v. Stein*, 347 U.S. 201, 213, 74 S.Ct. 460, 468, 98 L.Ed. 630 (1954); *Norwegian Nitrogen Co. v. United States*, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933).

However, as Justice Harlan has emphasized, even in the complicated area of milk regulation, the judiciary "may not ... abdicate its ultimate responsibility to construe the language employed by Congress." *Zuber v. Allen, supra*, 396 U.S. at 193, 90 S.Ct. at 328. An agency's contemporaneous construction of its own enabling legislation "is only one input in the interpretational equation," whose import is greatest "when the administrators participated in drafting, and

directly made known their views to Congress in committee hearings." *Id.*, 396 U.S. at 192, 90 S.Ct. at 327–28. Appropriate guidance for determining the significance to be accorded the Secretary's interpretation is furnished by *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944), in a passage quoted with approval in *General Electric Co. v. Gilbert*, 429 U.S. 125, 141–42, 97 S.Ct. 401, 410–11, 50 L.Ed.2d 343 (1976):

> "We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."

To demonstrate the reasonableness of his interpretation, the Secretary begins with the statute's express authorization to classify milk, and therefore shrinkage, upon either of two grounds, "according to the form in which, or the purpose for which, it is used." The Secretary first reasons that the shrinkage provision may be sustained because it merely classifies milk "in accordance with the form in which . . . it is used." He defends this interpretation of his statutory authority as a straightforward application of the plain meaning of the statute. See Govt. Br. at 15, quoting Vol. 6, Doc. 101 at 14, citing *Queensboro Farm Products, Inc. v. Wickard*, 137 F.2d 969, 975–77 (2d Cir. 1943).

The ordinary meaning attributable to this language clearly supports the Secretary's position. Definitions 3 and 4 of the verb "use" in Webster's New International Dictionary 2524 (3d ed. 1971) [4] amply bear out Judge Learned Hand's observation in dissent in the *Queensboro* case, that it is "exactly fitted to express the form in which

[milk] was marketed for consumption, or lost its identity as a raw product." 137 F.2d at 183. Although Judge Hand was not writing for the court, there is every reason to believe, as he clearly assumed they did, that the majority agreed that marketing and processing could be distinct, operative events for classifying milk according to its form at those junctures, as opposed to merely the form in which milk was moved, the issue in the *Queensboro* case, which Judge Hand considered was not a "use" and therefore an unauthorized basis for classification under the Act.

"The starting point in every case involving construction of a statute is the language itself." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring). "If the statutory language is clear, it is ordinarily conclusive," *United States v. Clark*, —— U.S. ——, 102 S.Ct. 805, 809, 70 L.Ed.2d 768 (1982), "absent a clearly expressed legislative intention to the contrary." *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 100 S.Ct. 2051, 2057, 64 L.Ed.2d 766 (1980).

Here, plaintiffs have offered no convincing ground for avoiding the plain import of the statutory language. They point out that *Queensboro* rejected the contention that classifying milk "according to the form in which it is used" meant its form as marketed for ultimate consumption by someone further along the chain of purchasers from the regulated handler, but this is no reason not to apply in this case the plain meaning the *Queensboro* court attributed to the very statutory phrase at issue here:

> "The Secretary, in his order, can lawfully say that, when a handler processes milk into cream, and delivers it to a purchaser in the form of cream, the handler is 'using' (or making a utilization of) the milk as cream." 137 F.2d at 976.

Although the *Queensboro* opinion associates "use" with "delivery for purchase," which plaintiffs urge supports their view that "use" is keyed to a handler's sales value,

---

4. "[T]o carry out a purpose or action by means of: make instrumental to an end or process:

apply to advantage: turn to account: UTILIZE . . . to expend or consume by putting to use."

nothing in that opinion or the others plaintiffs have cited excludes the classification of milk solely according to the form in which it was processed or "lost its identity as a raw material," without regard to delivery. Milk processed into packaged fluid milk for drinking is thus "used" as such fluid milk just as the milk processed into cream in the *Queensboro* case was "used" as cream. Clearly, both the processing and the sale of milk constitute separate uses thereof.

Referring to the alternative ground on which milk can be classified under the statute, the Secretary maintains that a reasonable interpretation of the statutory language again clearly supports the method of allocating shrinkage under the prior New York order. The phrasing "purpose for which [milk] is used" clearly pertains at least to the ultimate disposition made of the milk. See *Queensboro Farm Prods. v. Wickard, supra,* 137 F.2d at 976. Here there is no dispute that plaintiffs' ultimate purpose was the packaging and distribution of fluid Class I milk. As the Judicial Officer held:

"In considering the purpose for which such milk is used, the Secretary could reach two opposite—but both reasonable—conclusions.

First, the Secretary could reason that milk which becomes shrinkage from a fluid milk packaging operation was used in fluid form for the purpose for which it was intended to be used, *viz.,* in the production of packaged milk. No unexpected or unintended circumstance thwarted the handler's intended use of the milk. The handler knew that it takes 101 or 101½ quarts of producer milk to produce 100 quarts of packaged milk. The quart or quart and a half lost as shrinkage was an inevitable and expected use of the milk for the purpose of producing 100 quarts of packaged milk. In the circumstances, the quart or quart and a half lost as shrinkage had value to the handler (just as the pasteurizing equipment had value to the handler), *i.e.,* it was used to produce 100 quarts of packaged milk. Petitioners' argument that shrinkage has no value ignores all value except sales value. It ignores the value of the shrink-

age as an indispensable part of petitioners' production supplies." Vol. 6, Doc. 101 at 15–16 (footnote omitted).

Besides their basic contention that by the word "use" Congress intended to authorize the Secretary to classify milk only according to the narrow "value"-laden meaning plaintiffs favor, and not also in accordance with the ordinary meaning attributable to the statutory language, plaintiffs have not shown that the Judicial Officer's reasoning is fundamentally flawed or unreasonable. Comparing their own considerable efforts to secure proof of pre-enactment and contemporaneous understanding of the classification system, they decry the Secretary's lack of documentary or oral evidence that cooperatives or other authorities classified shrinkage in the class to which was assigned the product with which, according to the Secretary's rationale, the shrinkage reasonably could be associated. But this caviling ignores that Congress entrusted the Secretary with administering the statute, and relied on his expertise to give the statutory language a practical application in the regulatory context. The Secretary's contemporaneous and long-standing interpretation of the scope of his authority, delineated by the Judicial Officer, is thus entitled to deference since it is a reasonable interpretation of the ordinary meaning attributable to the statutory language, and clear evidence of a contrary, more confining legislative intent is lacking.

The reasonableness of the Secretary's view gains assurance from the unreasonable consequences of the plaintiffs' interpretation. If plaintiffs are correct that the potential sales value of milk to a handler is the basis for classification, their argument proves too much. As noted in *Oak Tree I,* 390 F.Supp. at 858, plaintiffs' theory of handler value still invites invalidation of order provisions which classify shrinkage in excess of the allowed percentage as Class I, even when the shrinkage occurred in the course of Class II operations. No reason comes to mind, and no sound one has been proffered how "excess" shrinkage can represent a different value to an inefficient handler than "ordinary" shrinkage does to

an efficient one. Yet plaintiffs still accept the regulatory classification of excess shrinkage in Class I, while attacking the pro rata principle which assigns their shrinkage to Class I.

Plaintiffs seek to evade the apparent inconsistency of their position by calling this treatment of excess shrinkage a "reasonable administrative differentiation," Oak Tree Br. at 27, based upon the Secretary's finding, see 33 Fed.Reg. at 7194, that a reasonably efficient handler should not lose more than two percent of the milk received to shrinkage under butterfat and skim milk accounting, and by asserting that "from a prophylactic regulatory standpoint" the Secretary fairly may consider "excess" shrinkage "not shrinkage at all." Dellwood Reply Br. at 23. These arguments, however, do not dispel the problem that the value of shrinkage, as plaintiffs have defined it, does not vary according to its volume. Moreover, to the extent that plaintiffs suggest the Secretary could create, in effect, an irrebuttable presumption that excess shrinkage was a volume of milk marketed in Class I, they are unsupported by any such factual findings or administrative or judicial construction.

Two further matters bear upon the reasonableness of the Secretary's interpretation. One is the decision in *Fitchett Bros., Inc. v. Butz*, No. 73 CV 235 (S.D.N.Y. Oct. 19, 1976) (Govt. Br., App. B), which rejected an earlier challenge to the method of classifying shrinkage brought by one of the present plaintiffs. Judge Goettel commented that "on the face of it, the Order No. 2 approach of apportioning waste in light of the milk actually used seems the more equitable," *id.* at 6, than that used in the neighboring Connecticut market. The other is that the pro rating of shrinkage ensures a higher return to producers for their milk. It cannot be overlooked that the Act is intended to benefit producers. See *Waddington Milk Co. v. Wickard*, 140 F.2d 97, 101 (2d Cir. 1944).

Plaintiffs have been unpersuasive in their effort to establish that "use" has a special meaning exclusive of its ordinary usage and that Congress intended shrinkage to be placed in the lowest use classification.

They have simply taken a general statement in the legislative history that Congress intended the Secretary to adopt methods previously followed by producer cooperatives, including the classification scheme, and have heaped onto it terms from specific cooperative agreements and isolated passages from reports and studies on milk marketing arrangements, which concededly reflect that shrinkage at some times and places was classified in the lowest valued class. But this amalgam of contemporary understanding, bonded only by broad language in the legislative history, hardly proves plaintiffs' point.

While it is not fortuitous that historical materials exist, evidencing, directly or indirectly, a particular method of classifying shrinkage, it is significant that plaintiffs have not shown that any are specifically mentioned in the legislative history of this Act or related legislation. Moreover, since the legislative history apparently is silent on the matter of shrinkage, it is difficult to say that shrinkage was a matter that concerned Congress when it legislated. On the other hand, a case for possible Congressional scrutiny (and therefore awareness of shrinkage) might be made for two Federal Trade Commission reports on which plaintiffs rely, which apparently were forwarded to Congress upon completion. One, from 1936, is about the milk industry in four cities and contains two milk classification definitions favoring plaintiffs; the other, from 1935, apparently a more general study, refers to the "sales value" of the end product as the basis on which the handler was supposed to pay for milk under the "utilization system."

Whether these reports contribute anything to plaintiffs' argument is doubtful. The quotation relied upon from the 1935 report—"The intent of the utilization system is to pay the producer for his milk on the basis of the sales value of the particular product into which the milk enters"—rather supports the Secretary than plaintiffs, since by reason of its last phrase it can be understood to embody a "used to produce" concept. Initially, the inclusion of two market class definitions in the text of the 1936

report seems to endow the treatment of shrinkage which plaintiffs have drawn from those definitions with more substance than could the mere presence of "stark figures" in an appendix to this same report, which the Supreme Court said in *Zuber v. Allen, supra*, 396 U.S. at 194, 90 S.Ct. at 328, could "hardly" have created the " 'notoriety' " for a claimed administrative or pre-enactment practice, which might be accepted as "persuasive" evidence that Congress was aware of the practice when legislating and intended its continuation. Even so, the 1936 report does not specifically mention plant loss or shrinkage; it is only by implication that plaintiffs have derived how it was handled.

While it is possible to say with plaintiffs that cooperative agreements which may have been presented to Congress for study treated shrinkage in the specific manner they approve, this does not show that Congress considered them with the same eye for subtle inference about plant loss as plaintiffs have. Without more specific guidance from the legislative history than the general phrases on which plaintiffs have seized, *cf. United States Department of State v. Washington Post Co.*, —— U.S. ——, 102 S.Ct. 1957, 1960, 72 L.Ed.2d 358 (1982) ("passing references" and "isolated phrases" are not controlling in examining legislative history), it cannot be said that the matter of how to classify shrinkage was something Congress intended to settle by its statement of general approval for the classification schemes employed by the cooperatives. If plaintiffs' technical interpretation of the Act were what Congress intended with respect to shrinkage, it is not unreasonable to suppose that far clearer evidence of this intent would have been left by a Congress which in other portions of the Act so carefully defined and limited the power it was delegating. Perhaps the difficulty is that the matter of shrinkage at the time was of relatively minor importance. Nevertheless, plaintiffs' arguments from legislative intent are insufficient to overcome the ordinary meaning of the statute's language, and the deference to which the Secretary's reasonable interpretation of it is entitled.

A further matter of statutory interpretation must be addressed before the sufficiency of the record evidence supporting the Secretary's decisions is considered. The question is whether 7 U.S.C. § 608c(11)(C), which provides that:

> "[a]ll orders issued under this section which are applicable to the same commodity or product thereof shall, so far as practicable, prescribe such different terms, applicable to different production areas and marketing areas, as the Secretary finds necessary to give due recognition to the differences in production and marketing of such commodity or product in such areas[,]"

required the Secretary to find, based upon hearing record evidence, that the pro rata treatment of shrinkage, an approach almost unique to the New York marketing orders, "is solidly grounded in milk production and marketing differences peculiar to the New York-New Jersey area," 390 F.Supp. at 860. So this Court suggested in *Oak Tree I* "[w]ithout," however, "finally passing on the matter." *Id.* Correct interpretation is crucial because none of the Secretary's decisions or the underlying hearing records disclose such findings or a basis therefor.

On remand the Judicial Officer rejected the interpretation of § 608c(11)(C) suggested in *Oak Tree I.* Apart from interpreting the provision according to its purported plain meaning, he pointed out that this Court's interpretation threatened the validity of many existing milk order provisions, in which the Secretary may have adopted different approaches to deal with the same problem, without sufficient explanation as to actual market differences, or apparent justification beyond a preference for experiment. The Judicial Officer considered the discretion to experiment with different solutions to the same problem fundamental to the Secretary's ability adequately to regulate the concededly complex matter of milk.

On this appeal the Secretary has endorsed the Judicial Officer's interpretation of the statute, that the Secretary "is [not] required to adopt identical provisions in the absence of record evidence to justify a dif-

ference." Govt. Br. at 33. The Secretary argues that the interpretation favored in *Oak Tree I* "would, in effect, require comparative evidence as to the conditions in every marketing area each time an amendment was considered in any marketing area," *id.*, which would do violence to the administrative process because of the obvious evidentiary burdens posed. As did the Judicial Officer, the Secretary also objects to the curtailing of his discretionary power.

With the benefit of the Secretary's interpretation of the statute, not previously available, the Court has considered anew the statutory provision at issue. Certainly there is implicit in its language Congress' expectation that ordinarily the Secretary would issue similar order provisions in each marketing area. However, to allay apprehensions about federal administrators imposing order uniformity where local diversity should be recognized, Congress provided, in what must be considered unambiguous phrasing, that orders applicable to the same commodity in different marketing and production areas "shall, so far as practicable, prescribe such different terms . . . as the Secretary finds necessary to give due recognition to the differences in production and marketing of such commodity . . . in such areas." Congress' expectation, or apprehension of uniformity, however, is not a command that orders be uniform unless differences require otherwise. The statute does not state that orders "shall prescribe *only* such different terms" as the Secretary finds necessary to give due recognition to local differences.

■ Giving weight to the interpretation adopted by the Secretary on remand, and considering the violence threatened to existing orders and the Secretary's administrative discretion by the interpretation advanced in *Oak Tree I*, the Court now holds that 7 U.S.C. § 608c(11)(C) did not require the Secretary to make findings as to marketing or production differences in the New York-New Jersey area to explain why an almost unique method of shrinkage treatment was selected and continued in that marketing area, instead of the method followed in other milk marketing orders.

III

■ Plaintiffs next challenge the sufficiency of the record evidence to sustain the Secretary's decisions to promulgate and continue the Order 2 provisions classifying shrinkage by allocating it pro rata according to actual class dispositions. Four decisions and hearing records are involved: those for the initial promulgation in 1938; for the 1944 and 1968 amendments; and for the 1971 denial of an amendment.

*The 1938 Record*

Although only a single witness, a producer representative named J. A. Coulter, testified as to shrinkage in the proceedings leading to promulgation of the first New York marketing order in 1938, the Judicial Officer readily determined that the pre-Administrative Procedure Act promulgation of Order 2's predecessor was supported by evidence sufficient for the Secretary to find, as he did, 3 Fed.Reg. 1945, 1946 (1938), that "issuance of such order and all of the terms and conditions thereof," including the pro rata provision, "will tend to effectuate the declared policy" of the Act, 7 U.S.C. § 608c(4). See Vol. 6, Doc. 101 at 56–57. Coulter testified as follows:

"Well, my thought would be that loss should be allocated on the basis of shipments out of the plant—that is classifying shipments out of the plant. If the plant shipped all Class I, it seems to me that that loss is the handler's loss and if it is charged to all handlers alike, there is no discrimination between handlers." (1938 Hearing Tr. 1687, quoted at Vol. 3, Doc. 71 at 10 n.6.)

Plaintiffs contend that the decision to classify shrinkage by allocating it pro rata according to actual classes and volumes of use primarily reflects the desire on the part of producers to prohibit reclassification of milk within the marketing area once they had delivered it to the handlers' receiving plants. The 1938 Order met this desire by requiring classification of milk "in accordance with its utilization at, or movement from, the plant where received from producers," 7 C.F.R. § 927.4 (Cum.Supp.1939),

although milk moved to another plant outside the marketing area could be classified in accordance with its utilization at that second plant.

Plaintiffs attribute the "no-reclassification" feature of the New York order to pervasive producer distrust of handlers and the administrative complexity of tracing the actual utilization of milk through the multifarious operations of the handlers' plants within the marketing area, concerns which apparently were frequently voiced at the hearings. Plaintiffs also point out that the Judicial Officer accepted their contention that these concerns do not bear upon the matter of shrinkage, since some shrinkage is inevitable and therefore should cause neither distrust nor administrative complexity. See Vol. 6, Doc. 101 at 24. They accordingly contend that viewed as an offshoot of the no-reclassification rule arising from concerns irrelevant to shrinkage, the initial pro rata treatment of shrinkage necessarily was arbitrary and capricious. They argue further that requiring all milk moved as such into the marketing area from the plant where received to be classified in Class I, left nothing to pro rate, and that therefore Coulter's testimony did not truly embody a pro rata approach and cannot support the Secretary's decision. Emphasizing again that all milk moved into the marketing area was classified in Class I regardless of its subsequent use in a different class, they also argue that the pro rata treatment of shrinkage bears an insufficiently rational relationship to the Secretary's avowed reason for classifying shrinkage pro rata, *viz.*, to associate shrinkage with the product it was used to produce.

Plaintiffs' contentions fall short of proving that the 1938 adoption of pro rata treatment for shrinkage was arbitrary, capricious or otherwise not in accordance with law. The crux of two of their arguments is the correct observation that there could be no basis on which to pro rate shrinkage from operations within the marketing area, since all milk moved into the marketing area was already inalterably classified Class I at the plant where received, the site chosen for classification under the Order, even if used for Class II purposes inside the

marketing area. The conclusions built upon this premise, however, are flawed because overlooked is the fact that not all milk received from producers was moved as milk into the marketing area and classified Class I. At the least, some milk received from producers, which plaintiffs do not dispute had to be classified, accounted and paid for, was moved as milk to plants outside the marketing area, and the Order specifically provided that this milk could be classified at the plant where received, in accordance with its utilization at the second plant. *Id.* Since plaintiffs would agree that many of these "second" plants outside the marketing area were manufacturing operations, see Oak Tree Br. at 30 n.1, there clearly was a volume of milk to be classified in other than Class I, and therefore a volume of shrinkage to be allocated pro rata and classified and accounted for in that class. This is wholly apart from the volume of milk used to produce other than Class I products at the receiving plant itself, the shrinkage for which also could be classified pro rata. The pro rata treatment the Secretary adopted plainly was not surplusage, as plaintiffs' argument suggests, and was directly supported by Coulter's brief discussion, plaintiffs' contrary contention notwithstanding. Coulter's statement, "If the plant shipped all Class I ... that loss is the handler's loss," simply explains how he perceived the pro rata scheme would operate and does not signify that all shipments would be classified Class I.

Furthermore, in arguing that adoption of the pro rata treatment of shrinkage was another accommodation to the producers' desire to ban reclassification, and must be considered arbitrary and capricious since the treatment of shrinkage should not implicate the same producer distrust and administrative difficulties that justified no reclassification, plaintiffs have ignored that the "used to produce" concept espoused by the Secretary rationally justifies the method of treatment indicated by Coulter's testimony without reference to producer distrust and, moreover, is soundly based upon the then existing structure of the milk industry in the New York area. Plaintiffs

themselves recognize that most fluid packaging plants were within the marketing area and, conversely, most manufacturing plants were outside it. *Id.* Therefore the Secretary could reasonably decide that if all milk moved as such into the marketing area was to be treated as Class I, a proposition plaintiffs have not challenged, then the volume of shrinkage used to produce it should be classified in the same class. The pro rata treatment of shrinkage was validly promulgated as part of the 1938 order.

*The 1944 Record*

With the promulgation of Order 27 in 1938 the pro rata treatment of plant losses was codified as an exception to the classification in Class I of all milk, the utilization of which could not be established in another class, 7 C.F.R. § 927.4(b)(1) (Cum.Supp. 1939). After a renumbering placed it at § 927.3(b)(1), the provision's wording was expanded to clarify its application to the price subdivisions of each class and the Class I treatment to be accorded losses in excess of two percent. 6 Fed.Reg. 2944–45 (1941). Order 27 was then substantially amended as a result of proposals by handlers, producers and the Agriculture Department, following hearings held in mid and late 1944.

Drawing on proposals submitted by handlers and producers which were later read into the hearing record for Docket AO–71–A9, August 15–20, 1944 (Vol. 3, Doc. 71, Exh. 4 [hereinafter "1944 Tr."]), the Agriculture Department by hearing notice published proposed amendments to Order 27 "in the form in which they would appear in an amended marketing agreement and order." 9 Fed.Reg. 8099 (1944). Certain provisions of the proposed order were included verbatim from the existing order, and evidence as to them was not to be received. *Id.* Although the proposed Order also continued the principle of pro rata treatment of shrinkage, the Secretary does not dispute that the treatment of shrinkage was the focus of substantial proposed changes and does not argue that the pro rata treatment of shrinkage was not also open to change. Rather, the Secretary argues that the absence of any express desire to change this aspect of shrinkage provides ample record evidence to support the resulting amendments which continued it.

The Department's representative testified that with respect to the classification of shrinkage, the principal change was to shift the amount recognized from a blanket two percent on all milk received at the plant of classification, regardless of the operations conducted there, to an allowance of up to five percent on specific plant operations. The purpose was to make the treatment of shrinkage more uniform as between handlers conducting only one or several operations in the receiving plant, and as between handlers conducting the same operation in one or several plants. See 1944 Tr. 268, 286. Significantly, although the witnesses understood that all they were considering were the Order provisions to govern the method of classification of shrinkage, and had deferred determination of precise allowances to the contemplated "rules and regulations" meeting with the Market Administrator, no one proposed classifying and accounting for shrinkage from specific plant operations in a class other than that to which the resulting product was assigned, *i.e.*, the pro rata approach. *See id.* at 133–37.

The origin of the shrinkage allowance well explains the handlers' implicit support for the *pro rata* treatment. The New York Order classified in Class I all milk received from producers for which the handler could not establish classification in another class. Since shrinkage is milk for which the handler could not establish any actual class disposition, without an allowance it would be classified in Class I. Thus, the handlers, particularly the numerous manufacturing interests, undoubtedly welcomed the pro rata treatment of shrinkage since they would benefit by having saved, in effect, the difference between the Class I price and the price for the class comprising the product resulting from the plant operations for which the shrinkage was recognized. Plaintiffs' speculation that the prospect of producer or Department of Agriculture disapproval hindered or discouraged the handlers from requesting that all shrinkage be classified in the lowest use class regardless of the operation and class of the product for which

the shrinkage was incurred, does not excuse the lack of any disagreement with the Secretary's approach. The handlers clearly were content with what they had, and this is all that was needed to support the Secretary's decision.

## The 1968 Proceedings

In January 1968 hearings were held pursuant to a notice of hearing published the previous December on proposals to amend aspects of Order 2. The most significant of these were directed at changing the Order 2 basis for classifying and accounting for milk and milk products. Of three proposals specifically affecting the existing shrinkage provisions only one, submitted by plaintiff Fitchett Bros., proposed substantive changes, permitting additional plant loss allowances at a lower classification. The other proposals conformed the language of the plant loss provisions to the new accounting procedure. A fourth proposal to conform the Order 2 treatment of shrinkage to that in the Middle Atlantic Order was made in the course of the hearing.

The Secretary approved the proposed amendments changing the basis of Order 2's accounting and classification procedure. 33 Fed.Reg. 7190 (1968). Previously, milk and its products were classified in Order 2 based upon the butterfat content alone. The skim

milk remaining after butterfat was removed, for example, in making cream, was separately accounted for and a "fluid skim differential" was used to approximate the value of and pay producers for dispositions of fluid skim milk. The 1968 amendments introduced a new accounting and classification based on butterfat and skim milk content. Because of practical limitations, the new method shifted the focus of accounting for Class II uses from the butterfat content of a product that leaves or was on hand at the plant (see 7 C.F.R. § 1002.140 et seq., reprinted at Vol. 6, Doc. 97 at 6–13), to the butterfat and skim milk "[d]isposed of in any product other than a fluid milk [i.e., Class I] product," 7 C.F.R. § 1002.41(c)(1) (1970) (emphasis added). By contrast, the accounting focus for Class I remained as it was, i.e., the butterfat (and now also skim milk) "[d]isposed of as a fluid milk product," id., § 1002.41(a)(1). As a result of the change in accounting for Class II dispositions, the elaborate system of plant operation loss allowances became unnecessary. Since the former shrinkage provisions had been keyed to plant operations which were no longer relevant, the change in accounting method provided the occasion to modify those provisions. The significant portions of the Secretary's decision on this point, 33 Fed.Reg. at 7194, appear in the margin.[5]

---

5. "In application, shrinkage is handled much in the manner of a make allowance in that the volume of butterfat specifically accounted for in each plant operation or product is inflated by the specified plant loss allowance for such operation or product. The amount of shrinkage allowed is directly related to the number of movements or processings involved in reaching the ultimate product. Thus, there is theoretically no limit to the shrinkage which might be allowed on any particular volume of butterfat.... In the future, handlers must account separately for all skim milk and butterfat received in accordance with its classification either as Class I disposition or as used to produce products other than Class I. Once a Class II product is made it is treated as a final disposition unless reprocessed into another product in the same plant and in the same month. With this exception, whenever a Class II product is reprocessed in a plant, and thereby involved in a handler's accounting, it is treated as a receipt of other source milk. This is consistent with the accounting proce-

dure employed under Federal orders generally.

Under this procedure it is not necessary to account for shrinkage on a product by product basis. Shrinkage in reality represents plant receipts for which a handler cannot establish a disposition. Hence, it cannot specifically be associated with any particular product or plant operation except under circumstances where a plant is engaged in a single operation.

In the case of a fluid operation the skim milk and butterfat content of the milk and milk products received and disposed of by a handler can be determined through recognized testing procedures. However, in manufacturing operations the accounting problem is more difficult in that some of the water present in the milk as received from producers is removed in processing. Here the problem is to establish the respective volumes of skim milk and butterfat used to produce such products. This can be ascertained through the use of appropriate accounting procedures.

For present purposes the following should be noted.

Although "[w]itnesses at the hearing generally supported continuation" of Order 2's existing procedure for the accounting of shrinkage, the Secretary concluded that those provisions

"should be modified to provide that shrinkage shall be prorated between classes of use in the same proportion that the skim milk and butterfat, respectively, actually accounted for is classified," *id.*,

with amounts of shrinkage over two percent in any class being assigned to Class I. After reviewing the Order's existing procedure the Secretary explained why the new accounting method made it "[u]nnecessary to account for shrinkage on a product by product basis," and why the allowable shrinkage under the order should be limited to not more than two percent. Although acknowledging that the procedure followed under the existing order of assigning shrinkage, within the allowable limits, to the same class of use as the butterfat accounted for is substantially different from that provided in other Federal orders, the Secretary decided to continue it. He stated that

"such procedure appears to have precipitated no basic problems in the market and is generally supported by the industry. Accordingly, this procedure is continued for skim milk and butterfat, respectively, under the amended order." *Id.*

As the Judicial Officer held below, see Vol. 6, Doc. 101 at 42–55, the Secretary on this appeal argues that the 1968 decision including the pro rata treatment of shrinkage as part of the modified shrinkage provi-

sions does not require substantial record evidence support upon review under § 608c(15)(B) because a decision to "continue" an existing provision in the face of a proposal to change it is neither an order nor an amendment, see Govt. Br. at 35–37, 40–45. By emphasizing that the 1968 decision merely denied a proposal to change the Order, the Secretary's argument approaches a conclusion more fully elaborated by the Judicial Officer with respect to the 1971 proceedings (and discussed *infra*), that the Secretary's decision to continue pro rata treatment of shrinkage is essentially unreviewable once it was validly promulgated. The semantic argument that a "continuation" is different from an "order" or an "amendment" is belied, however, by what the Secretary clearly acknowledged happened in 1968, *viz.*, that he deliberately chose to continue the pro rata treatment as part of the amended shrinkage provisions despite a proposal to eliminate it.

The portions of the decision quoted above reveal that the Secretary considered that all aspects of the provisions his decision discussed were part of the amendments to Order 2. Thus, he explained the decision to use the pro rata assignment method "under the amended order" despite the proposal for change, in the same manner he sought to justify approving any other provisions of that order. Confirmation may be found in the fact that the pro rata treatment is included as an integral part of the shrinkage provisions in the Secretary's "Order Amending the Order Regulating the Handling of Milk in the New York-New Jersey Marketing Area," attached to and published with the Secretary's decision. No less than in the case of the 1944 amendments, the

It is reasonable to conclude, therefore, that shrinkage losses under the revised accounting procedure will not be as great as under the present procedure where the butterfat accounting starts with the product of ultimate disposition.

Experience in other Federal orders using a similar accounting procedure has clearly established that shrinkage losses of skim milk and butterfat, respectively, should not exceed 2 percent in any reasonably efficient operation.

Equitable administration of the order is dependent on a uniform, precise and complete accounting procedure. There is no evident reason on the hearing record why shrinkage experience in the market should not be similar to that in other Federal order markets. It is concluded, therefore, that allowable shrinkage of skim milk and butterfat, respectively, should be limited to not more than 2 percent and the amended order so provides. Shrinkage in excess of allowable limits, as under the present order, should be classified as Class I–A." 33 Fed.Reg. at 3194.

continued inclusion of the pro rata treatment of shrinkage under the 1968 decision of the Secretary must be considered part of the amendments adopted by the Secretary, and therefore subject to judicial review as to whether it was supported by substantial evidence. The "continuation" in each case was in the nature of reenactment, and clearly is subject to review as part of an amendment to an order, under § 608c(17).

The question thus arises whether the pro rata treatment of shrinkage was validly continued in 1968. Plaintiffs urge that it was not. They attack as unsupported by the record the Secretary's explanation that the pro rata "procedure appears to have precipitated no basic problems in the market and is generally supported by the industry," especially the latter. Review of the record demonstrates, however, that the Secretary lawfully continued the pro rata scheme for the reasons stated.

None of the proposals included in the hearing notice (31 Fed.Reg. 16273 (1966)) proposed eliminating the pro rata assignment of shrinkage. (The Fitchett proposal did not entirely eliminate proration, but simply redefined Class II to include certain operational losses Class I handlers customarily had accounted for in Class I.) In the course of the proceedings, however, the Hearing Officer accepted testimony by Dr. Paul Hand, an economist representing a producers' cooperative regulated under the neighboring Middle Atlantic Order 4, as a proposal to eliminate proration while reducing the maximum shrinkage to two percent, despite the objection of numerous Order 2 handlers, including some represented by Oak Tree's present counsel.[6]

Dr. Hand supported changing the basis of the classification and accounting scheme to butterfat and skim milk content. He proposed that shrinkage be allocated directly to Class II even for fluid operations as part of his contention that the maximum allowable percentage of shrinkage should be reduced from five percent to two percent under the proposed butterfat and skim milk account-

ing. The two percent limit, he testified, represented the common experience in all other federal milk order markets for the operations involved up to the point where classification occurred. Similarly, in those markets the two percent allowance was classified other than in Class I and he thus proposed to bring the New York Order completely in line with the other federal order markets in respect to treatment of shrinkage.

On cross-examination by the Department of Agriculture's representative, Dr. Hand acknowledged that his proposal of reducing the amount of allowable shrinkage in connection with the change in accounting method could be instituted without changing the shrinkage classification scheme followed in New York for thirty years. (Vol. 2, Doc. 60, Exh. A, Transcript of Proceedings on Docket AO–71–A50 (1967) (hereinafter "1967 Tr.") at 741. He then explained why he favored changing Order 2's classification scheme for shrinkage:

> "Well, there is certainly some loss associated with any operation. To allow credit in a lower class is recognized in all other federal Orders, and if it were not recognized in Order 2 *it could conceivably result in an unfair [dis]advantage to Order 2 handlers*, but the limitation should be similar with Order 2 handlers as with any other handlers on the one hand, and, on the other hand, a minimal allowance does not result in inefficient operations; in fact, it encourages efficiency." *Id.* at 742 (emphasis added).

On further cross-examination Dr. Hand sought to rebut the contention of his questioner, Chester Smith, that the pro rata assignment of shrinkage encouraged efficiency.

> "Well, to the point that it does not recognize the fact that you do have some shrinkage and penalizes the handler to the full extent of Class I it may encourage dishonesty, also, so I think you ought to give some recognition of actual losses

6. The primary focus of the objections was the reduction in the percentage of shrinkage allowed.

which are incurred in any efficient operation." *Id.* at 750.

He acknowledged, however, that "[r]elatively speaking" pro rata assignment of shrinkage would encourage efficiency, although not beyond the point of inevitable loss.

Dr. Hand's other testimony concerning shrinkage related primarily to his proposal to reduce the maximum shrinkage allowance from five percent to two percent. This confused many representatives of manufacturing interests, who believed the proposal would deprive them of loss allowances they had received since 1945. Indeed, Dr. Hand stated that his proposal would eliminate the Rules and Regulations of the New York Order relating to the procedures followed in accounting for shrinkage in processing operations. *Id.* at 333.

Clearly, several of these witnesses who favored retaining the existing scheme, *e.g., id.* at 1106–09 (testimony of Alan Hochberg); *id.* at 1112, 1116 (testimony of Fred Fox); *id.* at 551, 555 (testimony of Chester Smith), did so since they were familiar with its benefits and did not fully understand how the new accounting system would operate. They viewed the proposed reduction in allowable shrinkage from five percent to two percent in the context of plant loss allowances for specific operations, without realizing that those allowances were almost wholly superfluous since they now were to account for butterfat and skim milk not at the end but just prior to the start of processing. In fact, this aspect of the proposed accounting change had been established earlier in the cross-examination of Chester Smith, *id.* at 558, and more thoroughly in the cross-examination of Dr. Hand, *id.* at 803–04, 806–07, 809–10, but evidently not to the complete understanding of the manufacturing interests' representatives.

The other major testimony concerning shrinkage came from witness Mac Levin in support of the Fitchett proposal to redefine Class II to include certain items of loss incurred by Class I handlers. These included "½% by weight of receipts by bulk tank at farm weight," "milk and milk products lost or destroyed under extraordinary circumstances, if such loss is established by records," and losses incurred in the course of packaging products for sale.

In explaining why producers should have to bear some of the cost of a Class I handler's losses, Levin stated as follows:

"Now my understanding, Mr. Derr, of the marketing orders is that the producer should get all milk and milk products utilized and sold as Class I, plus anything over a reasonable loss which is unaccounted for, in Class II.

I don't see why the producers—and I don't think they do expect to get Class I on any products, so-called skim milk and butterfat, that may go down the sewer or down through some extraordinary circumstance is lost, or packaging which is lost.

This is a problem of the handler and that's why the appeal is made in this product accounting, or skim milk and butterfat accounting, that weight should be given by the department to properly effect where the pricing should be of the plant loss, and that's all I am appealing, appealing to the effect that, let's give more equity to the processor. He has his problems.

We are not here to plead for him but we are here to try to help him in bringing down his costs of processing so they can pass on the savings to the consumer, who is yelling high hell about the cost of milk to him." *Id.* at 1007.

At this point, however, it bears noting that the handlers did not entirely ignore the matter of how to allocate shrinkage. In summarizing their position at an earlier stage of the hearing, after Smith's testimony but before the renewed expressions of concern about elimination of the five percent plant loss allowance, the handlers stated that they had "[n]o objection at this time to the method of calculating the butterfat and skim values in the respective classes." Vol. 5, Doc. 71, Exh. 6A, 1967 Tr. at 698.

On the foregoing record evidence, the Secretary was justified in continuing to allocate shrinkage according to a handler's actual dispositions. Dr. Hand's testimony

that not to conform Order 2 to the other federal Orders permitting allocation of shrinkage in the lowest use class "could conceivably" disadvantage Order 2 handlers, properly could have been disregarded as speculative and therefore insufficient to sustain the proposal. See *Borden Inc. v. Butz*, 544 F.2d 312, 316–17 (7th Cir. 1976).

Levin's testimony similarly was unsupported by anything more concrete than an appeal to equity. He made no substantive attempt to show why producers should absorb any part of a Class I handler's operating losses, in terms of the continued ability of Fitchett or any other Class I handler to supply fluid milk to the Order 2 market in the face of competition from handlers regulated under marketing orders that allocated a reasonable percentage of shrinkage automatically to Class II. Furthermore, responding to cross-examination by an Agriculture Department marketing specialist, he acknowledged that under his concept of assigning shrinkage to the lowest use class in a handler's plant the handler would gain by misrepresenting his Class I dispositions in order to pay for the butterfat and skim milk at the lower Class II utilization price. 1967 Tr. at 1014.

In sum, no witness established any basis on which it would have been appropriate to change a practice which, for want of such evidence, could properly be declared "to have precipitated no basic problem in the market." Although the handlers' expressions of support for the existing shrinkage provisions should be discounted in part because there was some misunderstanding of how the new accounting method would operate, it is significant that only Fitchett sought to shift some shrinkage out of Class I, and that other handlers collectively expressed satisfaction with the pro rata method. The Secretary had a substantial basis to conclude, therefore, that the existing method had industry support, in that it was not the object of industry-wide criticism. The Court accordingly concludes that substantial record evidence supported the Secretary's decision to continue the pro rata treatment of shrinkage under the amended order.

*The 1971 Proceedings*

Pursuant to notice published on March 12, 1971, the Secretary on March 30–31 and April 1, 1971, held hearings on proposals to modify provisions of four milk marketing orders, including one to revise the shrinkage provisions of Order 2. This proposal, submitted by three regulated handlers, sought to conform Order 2's shrinkage provisions with those in Order 4 by eliminating the requirement that shrinkage be allocated pro rata to classes of use in accordance with the respective volumes of skim milk and butterfat actually accounted for in each class.

The Secretary ruled that "[n]o change should be made in the shrinkage provisions . . . on the basis of this record." 36 Fed. Reg. 17580, 17582 (1971). In reaching this decision, the Secretary reviewed the testimony of the proponents' main witnesses that Order 2's treatment of shrinkage resulted in a higher cost of milk to Order 2 handlers than competing handlers experienced under Order 4 where shrinkage up to two percent was allocated automatically to Class II. The witness had estimated the difference between the Class I and Class II prices in Order 2 was between four and five cents per hundredweight, suggesting that this was the amount by which the Order 2 handlers were disadvantaged in competing with Order 4 handlers. Nevertheless, the Secretary declined to eliminate the pro rata method, reasoning as follows:

"While the terms of a given order must apply uniformly to all handlers subject thereto, the Act prescribes that orders applicable to the same commodity (i.e., milk) so far as practicable shall prescribe such different terms as are necessary to give due recognition to the differences among areas, and that the terms of each order shall be based solely on the evidence adduced on the record of a public hearing called for that purpose. Consequently, where conditions and circumstances of regulation vary between markets, the order provisions also vary. Thus, the provisions of Orders 2 and 4 differ significantly with respect to pool-

ing standards, point of pricing, price level, location differentials and their application, and the handling of shrinkage, to name a few. Each of these differences can and does have a significant effect on handlers' costs for milk. However, the respective provisions of the two orders were adopted on the basis of conditions in the markets reflected in separate and different records.

It is not sufficient simply to allege that the difference in shrinkage provisions results in unfair advantage to Order No. 4 handlers. Proponents have the burden of establishing the propriety of adopting Order 4 provisions under the conditions for handling and processing milk that prevail in the New York-New Jersey market. This they did not do. In this regard, it must be recognized that shrinkage under normal circumstances is an unaccounted for disappearance. The treatment of shrinkage, therefore, is intricately interrelated with the particular accounting and verification procedure employed under the order and the circumstances in the market."

In rejecting plaintiffs' challenge to this decision as contrary to law, the Judicial Officer declared that "nothing in the [Agricultural Adjustment] Act requires that evidence support the Secretary's refusal to adopt a proposal." Vol. 6, Doc. 101 at 44. As he observed, the Act expressly requires decision making based upon substantial record evidence only when the Secretary takes the affirmative step of issuing an order or

amendment. Under 7 U.S.C. § 608c(4) the Secretary

"shall issue an order if he finds, and sets forth in such order, upon the evidence introduced at such hearing . . . that the issuance of such order will tend to effectuate the declared policy of this chapter with respect to [the regulated] commodity."

The same requirements are applicable to amendments to orders. 7 U.S.C. § 608c(17).

By contrast, according to the Judicial Officer,

"[i]n determining not to issue a proposed amendment, the Secretary is purely at his own discretion and can rely upon his own expertise and knowledge, upon evidence from other hearings, or indeed upon no evidence at all." Vol. 6, Doc. 101 at 47.

Furthermore,

"[i]f the Secretary, in his discretion, relying upon the record and his total knowledge and expertise, cannot find that the proposed amendment will tend to effectuate the policy of the Act, then he is not required to issue the amendment, regardless of what evidence was presented at the hearing." *Id.*

The Judicial Officer declared, moreover, that a determination not to issue a proposed amendment is not subject to judicial review. He reasoned that such a decision is "purely discretionary," a proposition purportedly supported by statements in various Supreme Court cases, including *United States v. George S. Bush & Co.*, 310 U.S. 371, 60 S.Ct. 944, 84 L.Ed. 1259 (1935),[7]

**7.** In *United States v. George S. Bush & Co.*, 310 U.S. 371, 380, 60 S.Ct. 944, 946, 84 L.Ed. 1259 the Court stated:

"It has long been held that where Congress has authorized a public officer to take some specified legislative action when in his judgment that action is necessary or appropriate to carry out the policy of Congress, the judgment of the officer as to the existence of the facts calling for that action is not subject to review. . . . As stated by Mr. Justice Story in *Martin v. Mott* [12 Wheat. 19], pp. 31–32 [6 L.Ed. 537]: 'Whenever a statute gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction, that the statute constitutes him the sole and

exclusive judge of the existence of those facts.' "

The situation in the *Bush* case is hardly comparable. There Congress had empowered the President to approve a Tariff Commission's recommendation as to increases in rates of duty " 'if in his judgment such rates of duty and charges are shown by . . . investigation of the commission to be necessary to equalize such differences in cost of production.' " 310 U.S. at 377–78, 60 S.Ct. at 945–46. Courts traditionally have been reluctant to trench upon the Chief Executive's exercise of discretion. Such deference is less appropriate where Congress has delegated authority to a lesser official.

observing that the Administrative Procedure Act ("APA") expressly applies "except to the extent that agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). See Vol. 6, Doc. 101 at 42–55.

Plaintiffs dispute the Judicial Officer's assertion of nonreviewable discretion to refuse to issue an order. They further contend that the decision cannot be upheld because it is without support in the record; and it is undisputed that all the testimony at the 1971 hearing supported the proposal to eliminate the pro rata allocation of shrinkage. More specifically, plaintiffs argue that the Secretary was required, but failed, to put on the record and explain in his decision any information or expertise leading him to believe that the purposes of the Act would not be served by the proposed order or amendment. Only in this fashion, they contend, may a reviewing court "evaluate the rationality of the decision" and determine "that the Secretary has not abused his discretion." Dellwood Br. at 39.

Although the Secretary presses less fervidly than the Judicial Officer the argument that there is no judicial review of the 1971 decision, that he so contends is clearly suggested by his quotation of the passage from United States v. George S. Bush & Co., supra, relied upon by the Judicial Officer. A further indication is his adoption of another portion of the Judicial Officer's decision, in arguing that the validity of the pro rata treatment rests not on the 1968 or 1971 hearing records but on the record of its original promulgation.

To the extent the Secretary adopts the Judicial Officer's position that a determination not to issue a proposed amendment is "purely discretionary" and therefore not reviewable under the APA, he cannot be sustained. Although "agency action ... committed to agency discretion by law," 5 U.S.C. § 701(a)(2) is excepted from the APA's general rule of reviewability, this "very narrow" exception applies "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402,

410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971) (quoting legislative history).

Clearly, the discretion exercised in this case is implied from the grant of authority to issue marketing orders "if" the Secretary finds that doing so will tend to further the purposes of the Act. The discretion thus conferred differs in kind from the affirmative grants of authority involved in Citizens to Preserve Overton Park, supra, and Greater New York Hospital Association v. Mathews, 536 F.2d 494, 497–98 (2d Cir. 1976). It is appropriate, however, to consider whether reasons other than the statute's generality and lack of express standards might render the subject matter of the administrative action " 'inappropriate for judicial consideration.' " Langevin v. Chenango Court, Inc., 447 F.2d 296, 302–03 (2d Cir. 1971), quoting K. Davis, Administrative Law Treatise, 1970 Supplement § 28.16 at 965.

The administrative action which plaintiffs contend is subject to review is a refusal to issue an amendment to an order after formal rulemaking procedures on the record. Almost squarely on point as to the availability of review in such a case is the decision in Natural Resources Defense Council Inc. v. Securities and Exchange Commission, 606 F.2d 1031 (D.C.Cir.1979). At issue there was the SEC's refusal, after informal rulemaking proceedings, to promulgate rules requiring comprehensive disclosure by corporations of their environmental and equal employment policies. The court held that the decision was subject to "at least a minimal level of judicial scrutiny." Id., 606 F.2d at 1047. On the other hand, the scope of review was "narrow" and "limited to ensuring that the Commission has adequately explained the facts and policy concerns it relied on and ... that those facts have some basis in the record." Id. at 1053. The ultimate question on review became "whether these facts and legislative considerations by themselves could lead a reasonable person to make the judgment that the agency has made." Id., quoting Weyerhauser Co. v. Costle, 590 F.2d 1011, 1027 (D.C.Cir.1978).

The Court of Appeals in *Natural Resources, supra,* identified three factors to be weighed in determining whether an agency's action is the proper subject of judicial review; "the need for judicial supervision to safeguard the interests of the plaintiffs; the impact of review on the effectiveness of the agency in carrying out its congressionally assigned role; and the appropriateness of the issues raised for judicial review." 606 F.2d at 1044. The final inquiry is whether any considerations favoring nonreviewability "are sufficiently compelling to rebut the strong presumption of judicial review." *Id.*

Unlike the S.E.C.'s governing statutes, the Agricultural Adjustment Act "does not contain a mandate phrased in broad and permissive terms," *Zuber v. Allen, supra,* 396 U.S. at 183, 90 S.Ct. at 323 (1969), empowering the Secretary to promulgate rules beyond those specified in the statute. See 7 U.S.C. § 608c(5). Nevertheless, within this statutory framework, the Secretary clearly was not under any obligation to adopt rules identical to those proposed by any petitioner. See *Jones v. Bergland,* 456 F.Supp. 635, 648 (E.D.Pa.1978). Whether to include any of the prescribed general terms in any order, and the particular formulation of an order's terms to meet the circumstances of the order market clearly are matters Congress left to the Secretary. Where discretion exists as to the propriety of taking some action, a refusal to take requested action, *e.g.,* adopt a proposed rule, by itself will "rarely present unusual or compelling circumstances calling for judicial review." *Natural Resources, supra,* 606 F.2d at 1045. As in that case, by refusing to issue the proposed order the Secretary did not infringe any of plaintiffs' substantive statutory or constitutional rights. Unlike that case, however, the plaintiffs here contend that by refusing to alter the *status quo ante,* the Secretary has singled out Order 2 handlers for "special and seemingly unfair treatment," 606 F.2d at 1045, vis-a-vis Order 4 handlers. On balance, therefore, the plaintiffs' interests favor judicial review.

As in *Natural Resources, supra,* some interference with the agency's "effective performance of its statutory mission," in terms of its budget and personnel planning must be recognized to flow from the exercise of judicial review. As the Court of Appeals observed, however, see 606 F.2d at 1045–46, the threat of such interference is less compelling where, as here, the agency has already granted the initial petition and held rulemaking proceedings on the proposal, rather than denying the petition at the outset, an alternative clearly open to the Secretary. See 7 C.F.R. § 900.3(a).

"When an agency agrees to conduct rulemaking proceedings, it evidences its view that the proposals are sufficiently meritorious to warrant further investigation, as well as its willingness to defend in court such rule as may eventually be adopted." 606 F.2d at 1046.

Finally, in considering the last of its three factors, the Court of Appeals recognized that many reasons for an agency's discretionary decision not to promulgate a rule by their nature simply may not be "well suited" for judicial appraisal, *id.* The task of review may be further complicated in the context of informal rulemaking where the record and reasons statement are not "narrowly focused on the particular rule advocated" by a petitioner. Here, however, the record and reasons statement perforce were "narrowly focused" on the proposed rule, since the formal adjudicatory proceedings mandated by the APA in 5 U.S.C. §§ 556 and 557 were made applicable by Congress' requirement that the Secretary issue orders "upon the evidence introduced at such hearing." 7 U.S.C. § 608c(4). See generally K. Davis, Administrative Law Treatise, § 6.3 (2d ed. 1979); *id.* § 10.7.

Considering all the factors enumerated above, and guided by the reasoning and conclusion reached in similar circumstances by a Court of Appeals well versed in the intricacies of administrative law, the Court is of the opinion that the Secretary's decision not to adopt the proposed amendment changing the allocation of shrinkage in Order 2 was subject at least to minimal judicial review.

There remains for determination the scope of review that may be exercised. Clearly, in issuing an order or amendment the Secretary must find upon evidence in the hearing record facts which warrant his required determination that each term of the order or amendment will tend to effectuate the policy of the Act. This much at least is required by 7 U.S.C. § 608c(4). Moreover, on judicial review of an order or amendment claimed to be "not in accordance with law," 608c(15)(B), the APA subjects the Secretary's findings and conclusions alike to review for "substantial" evidentiary support. See 5 U.S.C. § 706(2)(E). So also where the Secretary has denied a handler's request for exemption or modification of an order, the court's function is limited to "ascertaining whether or not his findings are supported by any substantial evidence and his conclusions authorized by law." *New York State Guernsey Breeders' Co-op., Inc. v. Wickard*, 141 F.2d 805, 808 (2d Cir.), *cert. denied*, 323 U.S. 725, 65 S.Ct. 58, 89 L.Ed. 582 (1944).

In denying the handlers' petition in 1971, the Secretary made essentially only this determination, that the proposal's proponents had not "establish[ed] the propriety of adopting Order 4 provisions under the conditions for handling and processing milk that prevail in the New York-New Jersey market." 36 Fed.Reg. at 17582. The issue thus is whether the quantum and quality of the proponents' evidence, as tested on cross-examination, were such that a reasonable mind might accept as adequate to support the conclusion that the evidence was sufficient to justify changing the order.

The proponents of the 1971 proposal did little more than establish that Order 2 pro rated shrinkage while Order 4 did not, and that Class I handlers in Order 1 paid between four and five cents more per hundredweight for their milk than if they were subject to the Order 4's treatment of shrinkage. On the obviously crucial matter of competition with Order 4 handlers, the proponents' main witness did not progress much beyond the obvious, that Order 2 and Order 4 Class I handlers competed. See 1971 Tr. at 505, 506, 507.[8]

Another witness, J. Dunlop, referred to one Order 2 handler he represented who faced price competition in an Order 4 market from Order 4 handlers, but even here the four to five cents per hundredweight difference on shrinkage was obviously less significant than the one-half cent per quart difference in Class I price the Order 2 handler had to meet from Order 4. See *id.* at 535. Furthermore, he could not say that there had been additional shipments of Order 4 milk into Order 2 marketing areas in northern New Jersey or that any handler had left the Order 2 area because of the shrinkage treatment. The remaining witnesses provided additional instances of handler dissatisfaction with the treatment of shrinkage but added nothing to an understanding of how the pro rata treatment of shrinkage affected Order 2 handlers in their primary role of supplying milk and milk products to Order 2 markets.

Based on the foregoing, the Secretary was amply justified in declining to issue the requested modification. The proponents provided no substantial justification for altering the Order's treatment of shrinkage from what it had been for over thirty years, to make it identical to that of the neighboring Order 4. There was scant proof of any competitive impact, and none with respect to Order 2 markets. Consequently, the only reason to change the Order provision would be some statutory compulsion for Order uniformity, but as shown in Part II, *supra*, pp. 28–31, uniformity is not required.

Plaintiffs object that the Secretary impermissibly reasoned that just as the Act requires that order provisions vary in order to meet differing conditions and circumstances, so special circumstances in the Order 2 market must have existed with respect to the factors relating to shrinkage

---

**8.** This contrasts with the situation in 1978 where the Secretary was able to decide that "[i]n the interest of minimizing interorder competitive problems attributable to differences in regulatory provisions, it is desirable that shrinkage be classified under Order 2 in essentially the same manner as provided under the Middle Atlantic order." 43 Fed.Reg. at 57915 (1978).

because in fact Order 2 and Order 4 differed in their treatment of shrinkage. But this presumption was clearly legitimate in the absence of any showing by plaintiffs that the Order's treatment of shrinkage was unrelated to any special factors.

For the reasons stated, the motion of defendant for summary judgment denying plaintiffs' request for relief is granted, and plaintiffs' cross-motions are denied.

SO ORDERED.